STATE OF IOWA, Appellee, v. TINE SMITH, Appellant.

No. 41395.

NOVEMBER 22, 1932.

C. J. Lambert, for appellant.

John Fletcher, Attorney-general, and Neill Garrett, Assistant Attorney-general, for appellee.

BLISS, J.—The defendant was convicted of the crime of assaulting Henry Goebel with the intent to murder him. The defendant was about 59 years old, and had spent most of his life in and about the town of What Cheer. He appears to have been a "jack-of-all-trades," doing common labor of all kinds for whoever might call him.

The prosecuting witness, Goebel, was 63 years old, and his occupation at the time in question and for several years past was farming. He lost his wife the preceding April.

For eight or nine years previous, Smith had been living with a woman whose maiden name was Jessy Surber. She was placed upon the witness stand by the State, and from an examination, partly in the presence of the jury and partly in its absence, and from the examination of other witnesses in the absence of the jury, the court concluded that she was either the common-law or ceremonial wife of the defendant, and sustained the defendant's objection to her appearing as a witness against him. She denied that she was either the statutory or common-law wife of the defendant, but admitted that she had lived with him about three years, "off and on." We may assume from the record that her testimony would have been adverse to the defendant.

In the forenoon of August 5, 1931, Goebel and she and one Charles Ladley and her brother-in-law and his wife went into the country in Goebel's car, to look at some timber land. They ate dinner at the brother-in-law's, and about eight o'clock P. M. she

and Goebel and Ladley returned in the same conveyance to her home in southeast What Cheer. She and the defendant were living in this home. Each had contributed to its purchase, and the property had been deeded to her as Jessy Smith, and so appeared of record.

Goebel's hired man and his wife and the 21-year-old daughter of Goebel and another lady each testified that, about noon of August 5th, each of them had heard the defendant say that he was going to shoot or kill Goebel. Defendant denied this.

He had been assisting a neighbor in doing chores, and late in the afternoon took his Winchester shotgun, loaded with No. 6 birdshot, and went hunting, down along the creek back of his home. On his return, he was about to stop at his neighbor Nelson's home, directly east of his own place. As he came into the neighbor's yard, he saw an automobile turn south from the east and west road in front of his home, enter his own premises, and stop in the yard just west of his house. Instead of stopping at Nelson's, he continued westward along the road until he came to the front of his home, when he cut across in a southwesterly direction towards the left side of the automobile. He said he did not recognize them until he reached the car. The automobile was a four-door Whippet touring car, with steering wheel on the left side. Goebel was in the front seat behind the steering wheel. Jessy sat by his side, and Ladley was on the left side of the rear seat.

We will give first the State's version of what took place. As the defendant came into view, Jessy said: "There Tine comes with a club. Sit still and see what he is going to do." As the defendant drew near, they saw that the "club" was a gun. He came directly to the left side of the car, where Goebel was sitting, and with an oath said, "I am going to kill you." Immediately he shoved the barrel of the gun at Goebel's head, and as the latter grabbed it and pushed it aside, the defendant pulled the trigger, and the charge went through the upper right-hand corner of the top of the car. Goebel and Ladley, though remaining in the car, engaged in a scuffle with the defendant for the possession of the gun, and finally took it away from him. Ladley kicked the defendant, and the latter tore Ladley's trousers in the struggle. In the meantime, Jessy had got out of the car and came around in front of it and was struggling with the defendant.

The following is the defendant's story: When he recognized the occupants of the car, he said to Goebel and Ladley: "What

do you mean? I am going to give you a licking." Ladley replied, "There is no man about you." Defendant said, "Too much for you." Defendant was holding the gun under his left arm. The left rear door of the car was open and Ladley kicked him in the jaw. Defendant hit him with his right fist. Jessy grabbed the defendant's left arm, and he pushed her away, with the remark that he did not wish to hurt her. The defendant had his hands at the throats of Ladley and Goebel, with his wife tugging at him, and the gun under his left arm for a time. During this time the gun went off, but he did not have it in his hand, nor did he pull the trigger.

A lady occupying the house just west of defendant's home heard the shot and the racket and went to the door and saw the car and persons about it, but could not recognize them or hear what was said or see what they were doing. No one else testified as to what took place.

Shortly after the altercation, Goebel, Ladley, and Jessy drove out of the yard and went to the town marshal. Later, the marshal arrested the defendant at a neighbor's home and took him into custody. Goebel, Ladley, and Jessy returned to the defendant's home, where they stayed all night and had breakfast in the morning. The marshal testified that when he arrested the defendant, the latter said: "If it takes forty years, I will get him." The sheriff who took the defendant to the county jail the next day testified that the defendant then said: "If I ever get out, I will kill him yet."

Among the other assignments of error are the following, although we have not numbered them in the order in which they appear in appellant's argument:

1. The court erred in allowing Jessy Smith, wife of the defendant, to testify against him.

2. After permitting defendant's wife to testify for a time and then sustaining defendant's objection to her competency, the court erred in not withdrawing all of her testimony from the jury and instructing the jury that it could not be considered.

3. The court erred in refusing to admit certain photographs of the premises where the shooting took place.

4. The court erred in permitting the State to use certain witnesses who were not before the grand jury to testify, without notice, to matters not rebuttal.

378

5. The court erred in instructing as to no included offense below assault with intent to commit manslaughter.

6. The court erred in not permitting the defendant to show the prior unfriendly relations between defendant and Goebel.

7. The court erred in overruling defendant's motion for a directed verdict, and particularly the ground thereof that the State had used defendant's wife as a witness before the grand jury.

■ I. With respect to Assignment No. 4, we are satisfied that there was no error. Part of the testimony complained of was strictly rebuttal, and part of it might have been introduced in the State's main case. Under our holdings in State v. Graham, 203 Iowa 532, and State v. Slycord, 210 Iowa 1209, there was no error in using these witnesses in rebuttal.

■ II. In Assignment No. 6, the appellant complains because he was not permitted to show the bad feeling between the defendant and Goebel and that defendant had ordered Goebel to stay away from the former's home. Such testimony might have been proper were there an issue of self-defense in the case and a question of which was the aggressor. There were no such issues involved. The defendant was clearly the aggressor. There was no error in the court's ruling.

■ III. In Assignment No. 7, appellant complains of the over-ruling of appellant's motion for a directed verdict for the defendant, based upon the ground that defendant's wife, under the name of Jessy Surber, was used as a witness before the grand jury and the minutes of her testimony were attached to the indictment and her name was endorsed thereon. She testified that at the time of the alleged assault, the defendant came up to the car and pointed the gun at Goebel and said, "I am going to kill you, God damn you;" that he then shot over Goebel's head because Goebel pushed the gun away; that after the gun was taken from him, he said: "I am going to kill all of you sons of bitches." Goebel and Ladley testified before the grand jury of the defendant's threat to kill. Three other witnesses there testified of hearing defendant say he was going to kill Goebel. The marshall and the sheriff there testified as stated herein. The defendant had a copy of the minutes of the testimony before the grand jury, and he knew that the Jessy Surber therein mentioned was his wife. The testimony of Jessy Surber emphatically showed that as a witness she was against the defendant. In fact, she testified to a threat mentioned by no other wit-

ness. But the defendant was informed of this before trial, and if he desired to attack the indictment, he should have moved to quash it before the trial, and not wait and raise the question in the motion to direct. See State v. Houston, 50 Iowa 512. Furthermore, there was other testimony from other competent witnesses upon which the grand jury was warranted in returning the indictment. She was an incompetent witness, and should not have been permitted to testify before the grand jury; but the county attorney undoubtedly was in no way to blame. Under the circumstances, there was no prejudicial error.

■■ IV. Assignment No. 3 is based upon the refusal of the court to permit the defendant to introduce certain photographs of the defendant's home and the surroundings and showing the location of the automobile on the evening of the shooting. The foundation for the introduction of the exhibits was somewhat lacking. Furthermore there was no dispute about any matters which the photographs would have shown, and the refusal to admit them, if error, was not prejudicial.

■■ V. Assignments 1 and 2 will be discussed together. Jessy Surber was called as a witness by the State, and immediately upon taking the stand, objection was made that she was the wife of the defendant and was therefore incompetent, under Section 11260 of the Code, to be a witness against the defendant. The witness testified that she was not the wife. After some further preliminary examination, and cross-examination in the presence of the jury relative to her marital relations with the defendant, she and other witnesses were examined by defendant's counsel in the absence of the jury. The court permitted no further examination of the witness, and later in the progress of the trial sustained the defendant's objection. The jury was not informed of the ruling, nor was it admonished orally or instructed to give no consideration to the testimony of the witness nor to the fact that she was a witness. The court might well have done this although no request was made by defendant. None of the testimony given by the witness touched upon the alleged assault. Under the circumstances there was no error that was prejudicial.

■■ VI. Assignment No. 5 has to do with the failure of the court to instruct as to any included offense except that of assault with intent to commit manslaughter.

Appellant contends that this is a rather anomalous crime. However, we have recognized it for over fifty years, and since intent is

sometimes an element of manslaughter. and sometimes not, there is basis for designating such an offense.

We have set out the testimony as to what took place on the night of the shooting. If the defendant is to be believed he committed neither the crime charged nor the included offense. When there is evidence from which the jury might be warranted in finding that an included offense or one of lower degree was committed, the jury should, by the court's instructions, be given opportunity to so find.

The State contends that even though this be so, there is no error, because the jury ignored the one included offense of assault with intent to commit manslaughter, and found the defendant guilty of the crime charged, and that, therefore, the jury would have ignored instructions as to lower included offenses and offenses of lower degree, had such instructions been given.

While the writer is not entirely in accord with this contention and feels that the conclusion is not a non-sequitur in all cases, and that the omission to instruct cannot for the reasons given be said to be without prejudice in all cases, we have repeatedly held in support of the State's contention, one of the later cases stating the rule being State v. Grimm, 212 Iowa 1193.

It is our conclusion that there was no prejudicial error and that the judgment should be and is—Affirmed.

STEVENS, C. J., and EVANS, ALBERT, KINDIG, and CLAUSSEN, JJ., concur.